## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KRISTA ITZHAK and LYNDA MAURER, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| KISS NAIL PRODUCTS, INC., d/b/a KISS USA | |
| Defendant. | |

Plaintiffs Krista Itzhak and Lynda Maurer (collectively "Plaintiffs") file this class action complaint on behalf of themselves and all others similarly situated (the "Class Members") against Defendant, Kiss Nail Products, Inc. ("Defendant" or "Kiss"). Plaintiffs bring this action based upon personal knowledge of the facts pertaining to themselves, and on information and belief as to all other matters, by and through the investigation of the undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action suit brought against Kiss for aiding, agreeing with, employing, procuring, or otherwise enabling the wiretapping of the electronic communications of visitors to its website, https://www.kissusa.com/ (the "Website").

2.      Specifically, Defendant aids, agrees with, procures, or otherwise enables Meta Platforms, Inc. ("Meta"), a third-party service provider, to collect information from visitors to its Website.

3.      Through its Website, Defendant markets and sells beauty products, such as eyelash extensions, artificial nails, and hair products.

1

4.      Defendant enables Meta to eavesdrop on Website visitors' communications as they conduct searches for products on the Website without visitors' prior consent.  Defendant has enabled Meta's interception of visitors' communications by employing Meta's services to track users across the Website using Meta's pixel tracker—the Meta Pixel.

5.      The electronic communications made in response to Website visitors' searches conducted on the Website are contemporaneously captured or otherwise acquired by Meta to, among other things, assist Defendant with its marketing, advertising, and data analytics efforts.

6.      The nature of the Meta licensing agreement with Defendant is such that Defendant "aids, agrees with, employs, or conspires" to permit Meta to read, attempt to read, to learn, and/or to use the confidential communications of Website visitors without prior consent, thus violating the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 631(a).  Similarly, the nature of the Meta licensing agreement with Defendant is such that Defendant "procure[d] [Meta] to intercept or endeavor to intercept" electronic communications in violation of Pennsylvania's Wiretapping and Electronic Surveillance Act ("WESCA"), 18 Pa. Con. Stat. §§ 5701, *et seq.*

7.      Plaintiff Krista Itzhak brings this action on behalf of all California residents who conducted searches for products on the Website while in California, and whose electronic communications were intercepted or recorded by Meta.

8.      Plaintiff Lynda Maurer brings this action on behalf of all Pennsylvania residents who conducted searches for products on the Website while in Pennsylvania, and whose electronic communications were intercepted or recorded by Meta.

## THE PARTIES

### I.     PLAINTIFFS

9.     Plaintiff Krista Itzhak is an adult citizen of the state of California and resides in Irvine, California.

10.     Plaintiff Itzhak created a Facebook account around February 2009.  In February 2024, Plaintiff Itzhak visited Defendant's Website and used the search bar on the Website to search for "nails."  Plaintiff Itzhak searched for nails on the Website using the same browser she uses to access her Facebook account.  This communication was intercepted in transit by Meta—as enabled by Defendant.  Neither Defendant nor Meta procured Plaintiff Itzhak's prior consent to this interception.  Plaintiff Itzhak did not discover and could not have discovered this violation until approximately February 2024 upon her retention of counsel.

11.     Plaintiff Lynda Maurer is an adult citizen of the state of Pennsylvania and resides in Levittown, Pennsylvania.

12.     Plaintiff Maurer created a Facebook account around August 2006.  In February 2024, Plaintiff Maurer visited Defendant's Website and used the search bar on the Website to search for "nails."  Plaintiff Maurer searched for nails on the Website using the same browser she uses to access her Facebook account.  This communication was intercepted in transit by Meta—as enabled by Defendant.  Neither Defendant nor Meta procured Plaintiff Maurer's prior consent to this interception.  Plaintiff Maurer did not discover and could not have discovered this violation until approximately February 2024 upon her retention of counsel.

### II.     DEFENDANT

13.     Defendant Kiss Nail Products, Inc. ("Kiss"), is incorporated in the State of New York and has its principal place of business in Port Washington, New York.  Defendant is a

corporation known for its sale of beauty products such as eyelash extensions, artificial nails, and hair products.

## JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

15.    The Court has general personal jurisdiction over Defendant because Defendant is incorporated in the State of New York and its principal place of business is located in Port Washington, New York.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant is a resident of this judicial district.

## FACTUAL ALLEGATIONS

### I.    OVERVIEW OF THE META PIXEL

17.    Defendant enables Meta to intercept Plaintiffs' and Class Members' communications by employing the Meta Pixel on the Website in the manner described throughout this Complaint.

18.    Facebook describes itself as a "real identity platform,"[1] meaning users are allowed only one account and must share "the name they go by in everyday life."[2]  To that end, when

---

[1] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[2] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

creating an account, users must provide their first and last name, along with their birthday and gender.[3]

19.    Meta owns facebook.com and generates revenue by selling advertising space on that website, and other applications it owns, like Instagram.[4]  In 2021, Facebook generated $117 billion in revenue.[5]  Roughly 97% of that came from selling advertising space.[6]

20.    Meta sells advertising space by highlighting its ability to target users.[7]  Meta can target users so effectively because it surveils user activity both on and off its site.[8]  This allows Meta to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[9]  Meta compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[10]

21.    Advertisers can also build "Custom Audiences."[11]  Custom Audiences enable

---

[3] FACEBOOK, SIGN UP, https://www.facebook.com/

[4] Mike Isaac, *Facebook's profit surges 101 percent on strong ad sales*, N.Y. TIMES (July 28, 2021), https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.

[5] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[6] *Id.*

[7] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[8] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[9] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[10] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[11] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[12]  With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[13]

22.    Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Meta with the underlying data.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Meta's "Business Tools."[14]

23.    As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Meta, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[15]

24.    Put succinctly, Meta's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Meta to intercept and collect user activity on those platforms.

---

[12] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[13] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[14] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[15] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

25.     The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[16]  However, Meta's Business Tools can also track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[17]  Advertisers can even create their own tracking parameters by building a "custom event."[18]

26.     One such Business Tool is the Meta Tracking Pixel.  Meta offers this piece of code to advertisers, like Defendant, to integrate into their websites.  As the name implies, the Meta Tracking Pixel "tracks the people and type of actions they take."[19]  When a user accesses a website hosting the Meta Tracking Pixel, Meta's software surreptitiously directs the user's browser to simultaneously send a separate message to Meta's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data the Pixel is configured to collect.  This transmission is initiated by Meta code and concurrent with the communications with the host website.  Two sets of code are thus automatically run as part of the browser's attempt to load and a website: the website's own code, and Meta's embedded code.

---

[16] *See* FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[17] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[18] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[19] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

27.    An example illustrates the point.  Take an individual who navigates to Kiss's Website and searches for bodysuits.  Once the individual conducts the search, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because Defendant utilizes the Meta Tracking Pixel, Meta's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening.  Meta causes the browser to secretly and simultaneously duplicate the communication with Defendant, transmitting it to Meta's servers alongside additional information that transcribes the communication's content and the individual's identity.  This entire process occurs within milliseconds.

28.    In other words, when a user communicates with Defendant's website, those communications are simultaneously and contemporaneously duplicated and sent to Meta at the same time as they are being sent to Defendant.  Thus, Meta's interception of these communications occurs "in transit."  *See*, *e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, --- F. Supp. 3d ---, 2023 WL 7392285, at *15-16 (N.D. Cal. Nov. 8, 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

29.    After collecting and intercepting this information, Meta processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

30.     Meta's other Business Tools function the same.   For mobile applications, advertisers can utilize the Meta SDK, which contains "component SDKs," like the App Events API, allowing advertisers to track events on their mobile apps so they can "measure ad performance and build audiences for ad targeting."[20]

31.     Advertisers can also utilize the "Conversions API."   The Conversions API lets advertisers circumvent a user's choice to exercise privacy controls.[21]   More technically, the Conversions API is Meta code that advertisers can implement server-side.[22]

32.     Because it operates server-side, the Conversions API ignores users' decision to opt out of tracking, collecting the same data it would otherwise through "a connection between an advertiser's server and Meta's Conversion API endpoint." [23]

33.     When the Conversions API collects "[s]erver events," those data points are "linked to a Meta Pixel ID and are processed like web events sent via Pixel."[24]   As with the Meta Tracking Pixel, the Conversions API intercepts these communications contemporaneously and surreptitiously. [25]   Meta "recommend[s] that advertisers implement the Conversions API alongside

---

[20] FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[21]   FACEBOOK,   CONVERSIONS   API,   https://developers.facebook.com/docs/marketing-api /conversions-api.  This refers to device specific privacy controls.

[22] *Id.*

[23] *Id*.

[24] *Id*.

[25]   FACEBOOK, HANDLING DUPLICATE PIXEL AND CONVERSIONS API EVENTS, https:// developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events/ ("Once your event fulfills both conditions, we keep the first one and remove the following one.  If a server and browser event arrive at approximately the same time (within 15 seconds of each other), we favor the browser event.").

their Meta Pixel and follow other best practices."[26]

34.    Meta confirms, in its "Meta Business Tools Terms,"[27] that it has the capability to use the information it collects for purposes other than recording it and conveying it to Defendant. For instance, Meta can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products." In other words, Meta can use the wiretapped information for its own "research and development," and to "protect" its own products and services.

35.    Meta can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products."[28]

36.    Further, Meta can use the event data to help websites like Defendant's "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[29]

37.    Finally, Meta can use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products."[30]

38.    Thus, Meta has the capability to use the information it wiretaps for purposes other than simply providing a recording to its customers, including but not limited to its own contact

---

[26] *Id.*

[27] FACEBOOK, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

[28] *Id*.

[29] *Id*.

[30] *Id*.

information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

## II. DEFENDANT EMPLOYS THE META TRACKING PIXEL TO TRACK USERS ON ITS WEBSITE ENABLING META TO INTERCEPT USERS' COMMUNICATIONS WITH DEFENDANT

39.     Defendant has integrated the Meta Pixel, into its Website**.** By integrating the Pixel into its Website code, Defendant has enabled Meta to intercept Defendant's Website users' communications with Defendant as users search and browse for products on the Website without users' consent.

40.     Through the Meta Pixel, Defendant enables Meta to intercept users' communications with Defendant.  When a user conducts a search on Defendant's website, communicating with Defendant that they are interested in a particular product, because Defendant installed the Meta Pixel on its Website, the Meta Pixel generates two events, a PageView event and a Search event that share metadata to Meta.  The metadata for these events includes the exact search terms users input in Defendant's Website's search bar.

41.     For example, when a user searches for "nails" on the Website, the Meta Pixel generates a PageView event that includes metadata that tells Meta the user searched for "nails." *See* Figures 1-2.



**Figure 1**



**Figure 2**

42.    When a Website user searches for "nails" on the Website, the Meta Pixel also

generates a Search event that includes metadata that tells Meta the user searched for "nails."  *See*

Figures 3-4.



**Figure 3**



**Figure 4**

43.      Users' search terms on Defendant's Websites are communications that are a product of users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated).

44.      The names of products users search for and view on Defendant's Website are personal information because they "divulge a user's personal interests, queries, and habits." *See In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d at 605 (9th Cir. 2020).

45.      Further, beyond Meta intercepting Website users' communications to Defendant via the Website, Defendant enables Meta to pair the event data with a user's identity.  Specifically, the Meta Pixel pairs event data with a user's Facebook ID.

46.      When a user accesses Defendant's Website while logged into Facebook, the Meta Pixel will compel that user's browser to transmit the c_user cookie, which contains the user's unencrypted Facebook ID.  Figures 5 through 7 show a copy of the c_user cookie being transmitted to facebook.com, as shown on the webpage by accessing developer tools by clicking on the F12 button on a keyboard.



**Figure 5**

**Figure 6**



**Figure 7**

47.     The c_user cookie is personally identifiable information because it contains a

consumer's unencrypted Facebook ID.  A Facebook ID allows *anybody*—not just Meta—to

identify the individual consumer.  Specifically, if one types www.facebook.com/[FacebookID]

into a web browser, it will load that individual's Facebook page.  For example, the c_user cookie

in Figures 5-7 above is 100000984007553, and www.facebook.com/100000984007553 leads to

this individual's Facebook page.

48.     When a visitor's browser has recently logged out of an account, Meta compels the visitor's browser to send a smaller set of cookies.[31]  No matter the circumstances, Meta receives at least one cookie from a Website user's browser—the fr cookie.

49.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[32] The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser.[33]  The datr cookies also identifies a browser.  Meta, at a minimum, uses the fr and _fbp cookies to identify users.[34]

50.     The fr cookie expires after ninety days unless the visitor's browser logs back into Facebook.[35]  If that happens, the timer resets and another ninety days begins to accrue.[36]

51.     The _fbp cookie expires after ninety days unless the visitor's browser accesses the same website.[37]  If that happens, the time resets, and another ninety days begins to accrue.[38]

52.     The Meta Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, Defendant's Website.[39]  A third-party cookie is "created by a website with a domain name other than the one the user is currently

---

[31] Not pictured here is the _fbp cookie, which is sent as a first-party cookie.

[32] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf.

[33] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[34] *Id*.

[35] *Id*.

[36] Confirmable through developer tools.

[37] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[38] Also confirmable through developer tools.

[39] PC MAGAZINE, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

visiting"—*i.e.*, Meta.[40]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

53.     Meta, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

54.     Defendant uses these cookies to pair event data with personally identifiable information so it can later retarget consumers on Facebook.

## III.  DEFENDANT NEVER RECEIVED USERS' CONSENT TO EMPLOY THE META TRACKING PIXEL TO INTERCEPT USERS' COMMUNICATIONS

55.     Defendant enables Meta to intercept Defendant's Website users' confidential communications without obtaining users' consent.  At no point during a user's time accessing Defendant's Website does Defendant give users an opportunity to consent to Meta's interception of users' communications with Defendant.  Based on the information Defendant provides its Website users, users have no way of knowing that their communications are being intercepted by Meta.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff Krista Itzhak seeks to represent a class of all California residents who entered information into Defendant's Website by conducting searches using the search bar on the Website while in California (the "California Class").

57.     Plaintiff Lynda Maurer seeks to represent a class of all Pennsylvania residents who entered information into Defendant's Website by conducting searches using the search bar on the Website while in Pennsylvania (the "Pennsylvania Class").

---

[40] *Id*.  This is also confirmable by tracking network activity.

58.     Plaintiffs reserve the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

59.     The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after considering of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

60.     Excluded from the California and Pennsylvania Class are Kiss; any affiliate, parent, or subsidiary of Kiss; any entity in which Kiss has a controlling interest; any officer director, or employee of Kiss; any successor or assign of Kiss; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

61.     **Numerosity.**  Members of the California and Pennsylvania Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members of each Class is unknown to Plaintiffs at this time; however, it is estimated that there are hundreds of thousands of individuals in each Class.  California and Pennsylvania Class Members can be readily identified from Kiss's records and non-party records, such as those of Meta.

62.     **Typicality.**  Plaintiff Itzhak's claims are typical of the claims of the California Class because Plaintiff Itzhak, like all other members, visited Kiss's Website and had her confidential electronic communications intercepted and disclosed to Meta while in California. Plaintiff Maurer's claims are typical of the claims of the Pennsylvania Class because Plaintiff Maurer, like all other members, visited Kiss's Website and had her confidential electronic communications intercepted and disclosed to Meta while in Pennsylvania.

63.     **Adequacy.**  Plaintiffs are fully prepared to take all necessary steps to represent fairly and adequately the interests of the California and Pennsylvania Class.  Plaintiffs' interests

are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiffs are represented by attorneys with experience in the prosecution of class action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiffs' attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

64.    **Common Questions of Law and Fact Predominate**. Questions of law and fact common to the members of the California and Pennsylvania Class predominate over questions that may affect only individual members of the Classes because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include, but are not limited to, the following: whether Defendant violated the CIPA and the WESCA and whether Plaintiffs and the proposed Class Members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

65.    **Superiority.** Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh potential difficulties in the management of this class action. Plaintiffs know of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## CLAIMS FOR RELIEF

### COUNT I
**Violation Of The California Invasion Of Privacy Act,
Cal. Penal Code § 631**

66.      Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

herein.

67.      Plaintiff Krista Itzhak brings this claim against Defendant individually and on

behalf of the California Class.

68.      CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of

conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).  Thus, to establish liability

under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any

machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*

> Aids, agrees with, employs, or conspires with any person or
> persons to unlawfully do, or permit, or cause to be done any of
> the acts or things mentioned above in this section.

69. CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

70. The Meta Pixel is a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

71. Meta is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Meta had the capability to use the wiretapped information for its own purposes. Accordingly, Meta was a third party to any communication between Plaintiff Itzhak and California Class Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

72. At all relevant times, Meta willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff Itzhak and California Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

73. At all relevant times, Meta used or attempted to use the communications intercepted by its Pixel to promote and improve its advertising platform.

74.     At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled Meta to wiretap Plaintiff Itzhak and California Class Members using the Meta Pixel and to accomplish the wrongful conduct at issue here.

75.     Plaintiff Itzhak and California Class Members did not provide their prior consent to Meta's intentional access, interception, reading, learning, recording, collection, and usage of their electronic communications.  Nor did Plaintiff Itzhak and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling Meta's conduct.

76.     The wiretapping of Plaintiff Itzhak and California Class Members occurred in California, where Plaintiff Itzhak and California Class Members accessed the Kiss Website and where Meta—as enabled by Defendants—routed Plaintiff Itzhak's and Class Members' electronic communications to their servers.

77.     Pursuant to Cal. Penal Code § 637.2, Plaintiff Itzhak and Class Members have been injured by Defendants' violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## <u>COUNT II</u>
**Violation Of The Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. §§ 5701, *et seq.***

78.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

79.     Plaintiff Lynda Maurer brings this claim individually and on behalf of the Pennsylvania Class against Defendant.

80.     The WESCA prohibits (i) the interception or procurement of another to intercept any wire, electronic, or oral communication; (ii) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was

obtained through the interception of a wire, electronic, or oral communication; and (iii) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication.  18 Pa. Cons. Stat. §§ 5703(1)-(3).

81.    Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (i) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (ii) punitive damages; and (iii) reasonable attorneys' fees and other litigation costs incurred.  18 Pa. Cons. Stat. § 5725(a).

82.    At all relevant times, by using the Meta Pixel, Meta intercepted, used, and disclosed the electronic communications between Plaintiff Maurer and Pennsylvania Class Members on the one hand, and Defendant on the other hand.

83.    At all relevant times, Defendant intentionally procured the interception, use, and disclosure to Meta of the electronic communications between Plaintiff Maurer and Pennsylvania Class Members on the one hand, and Defendant on the other hand.

84.    Plaintiff Maurer and Pennsylvania Class Members did not provide their prior consent to having their electronic communications intercepted by Meta, nor did they provide their prior consent to having Kiss procure Meta to intercept and use their electronic communications.

85.    Plaintiff Maurer and Pennsylvania Class Members had a justified expectation under the circumstances that their electronic communications would not be intercepted by Meta.  Plaintiff Maurer and Pennsylvania Class Members reasonably believed these communications would only be accessed by Kiss, and not by a third party like Meta.

86.    Because the use of the Meta Pixel is not disclosed—certainly not before any

wiretapping occurred—Plaintiff Maurer and Pennsylvania Class Members were not aware that their electronic communications were being intercepted by Meta. Further, Defendant cannot avoid liability "merely by showing that [Plaintiff Maurer and Pennsylvania Class Members] unknowingly communicated directly with [the Third Parties'] servers." *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 129 (3d Cir. 2022).

87. The wiretapping of Plaintiff Maurer and Pennsylvania Class Members occurred in Pennsylvania, where Plaintiff Maurer and Pennsylvania Class Members accessed the Website and where the Meta Pixel—as procured by Defendant—routed Plaintiff Maurer's and Pennsylvania Class Members' electronic communications to Meta's own servers. *Popa*, 52 F.4th at 131.

88. Plaintiff Maurer and Class Members seek all relief available under 18 Pa. Cons. Stat. § 5725(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a) For an order certifying the putative Classes, naming Plaintiffs as the representatives of the putative Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the putative Class Members;

(b) For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the putative Classes on all counts asserted herein;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiffs and the putative Classes their

reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the proposed Classes, demand a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: June 24, 2024                      Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Alec M. Leslie*
      Alec M. Leslie

Alec M. Leslie
Max S. Roberts
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
E-mail: aleslie@bursor.com
        mroberts@bursor.com

*Attorneys for Plaintiffs*